[No. S033148. May 9, 1994.]

In re the Marriage of MARY AND RONALD DAMICO.
MARY DAMICO, Respondent, v.
RONALD DAMICO, Appellant.

COUNSEL

Richard P. Roggia for Appellant.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Carol Ann White, Gloria F. Dehart and Mary A. Roth, Deputy Attorneys General, for Respondent.

OPINION

**ARABIAN, J.**—In *Moffat* v. *Moffat* (1980) 27 Cal.3d 645 [165 Cal.Rptr. 877, 612 P.2d 967], we held that a parent under a court order to pay support for a minor child must pay that support even if the parent with custody interferes with the paying parent's right to visit with the child. We are now asked to decide whether a custodial parent who not merely interferes with visitation rights, but actively *conceals* the parent and child from the other parent until the child becomes an adult may thereafter seek arrearages for child support obligations accrued during the period of concealment. The Courts of Appeal are divided on the question to what extent, if any, concealment is a defense to the obligation to pay child support.

Concealment of the child and the custodial parent from the noncustodial parent until the child reaches the age of majority is different from mere

interference with visitation both in degree and in kind. As a difference in *degree*, it obliterates the entire relationship between the child and the noncustodial parent. This alone may not be sufficient to warrant a different rule than that of *Moffat* v. *Moffat, supra,* 27 Cal.3d 645. As a difference in *kind*, however, it makes impossible performance of the very child support payments that are the subject of the later arrearages action. This does distinguish *Moffat.* We conclude that such concealment may estop the custodial parent from seeking payment of child support arrearages which accumulated during the period of concealment. We therefore affirm the judgment of the Court of Appeal, which reached the same result.

FACTS

Appellant Ronald Damico (father) and respondent Mary Damico Austin (mother) were married in 1958 and separated less than a year later. A son was born to them on September 22, 1958. A judgment of divorce was entered in May 1960 which ordered father to pay child support. He paid the support for a short time, then stopped under circumstances that are disputed. In 1979, father was served with an application for child support arrearages. A default judgment was entered against him in June 1980 in San Francisco Superior Court determining that he owed $12,948.50 in child support arrearages from May 1959 through September 1978, plus interest in the amount of $10,264.22.

In January 1991, the Marin County District Attorney, acting on behalf of mother, filed a statement for registration of foreign support order, and served father. Father moved to vacate the registration of the foreign support order and the prior default judgment. At a hearing in August 1991 to determine the amount of arrearages, if any, father owed, he offered to prove the following.

In 1960, he visited with mother and the child in San Francisco. Mother told father that "she did not want [him] to see the child ever again and that [he] would not see the child ever again. She wanted [him] to remove [himself] from her life and from the child's life." Mother's brother then assaulted him with a knife, forcing him to flee. Father tried to call her several times to arrange to visit with the child, but the person answering would hang up as soon as he identified himself. Soon thereafter, mother "dropped out of sight and [father] could not find her or the child" despite numerous attempts to locate and contact them. From 1960 until 1979, after the child had become an adult, father "had no way of contacting or paying support to them." No one contacted him seeking support even though he was readily available. Father "had given up all hope of ever contacting [his] son in that [he] thought that [mother] had made good on her promise of never

letting [him] see the child, and had effectively secreted the child from [him]."

In 1979, according to the offer of proof, father was "shocked and amazed" to be served with the application for child support arrearages. He hired counsel to represent him in that proceeding, and he "moved to Arizona believing that this matter had been taken care of by that attorney." He later learned that his attorney did not appear for him, and a default judgment was entered. Father claims that had he "had knowledge of the whereabouts of [his] child and the [mother], [he] would have made payments in a timely fashion and attempted to visit [his] child in a responsible manner."

Mother filed a declaration in which she denied concealing the child from father. Rather, she claimed, father threatened to "abduct" the child, and did not pay child support. In 1963, after she remarried, she had the child's last name legally changed to her husband's surname. From 1964 until 1978, she "had no contact with [father], nor did [she] have any knowledge about how to locate him." Finally, in 1978, she was able to locate father and serve him with a motion for an order fixing arrearages.

The trial court ruled that father's offer of proof was not relevant to the issue of arrearages, and refused to consider his "concealment" defense. No evidentiary hearing on the question was held. The court ultimately ordered father to pay the entire amount of arrearages plus interest. Father appealed.

The Court of Appeal reversed. It rejected mother's argument that the earlier default judgment precluded father from raising the concealment defense at this time. It then held that while mere interference with visitation rights by the custodial parent does not present a defense to the enforcement of a child support order, active concealment does. It remanded the case for the parties to present evidence on the question of concealment.

Mother petitioned this court to review whether "evidence of a custodial parent's concealment of a child who is the subject of a child support order [is] admissible to estop the custodial parent from claiming child support arrearages from the absent parent for the period of concealment." We granted the petition.[1]

---

[1] In response to Justice Kennard's concurring opinion, we note that the Court of Appeal rejected mother's argument that the default judgment precluded raising the concealment defense at this time. In conformity with California Rules of Court, rule 29.2(a), which states that this court "may review and decide any or all issues in the cause," we granted review of only the issue concerning the viability of the concealment defense, which was, indeed, the only issue raised in the petition for review. The question of the effect of the default judgment

## DISCUSSION

In *Moffat v. Moffat, supra,* 27 Cal.3d 645 (*Moffat*), we construed Code of Civil Procedure former section 1694, part of the Revised Uniform Reciprocal Enforcement of Support Act, which provided in pertinent part: "The determination or enforcement of a duty of support owed to one obligee is unaffected by any interference by another obligee with rights of custody or visitation granted by a court."

Also pertinent to this question is Civil Code former section 4382, which provided: "The existence or enforcement of a duty of support owed by a noncustodial parent for the support of a minor child shall not be affected by a failure or refusal by the custodial parent to implement any rights as to custody or visitation granted by a court to the noncustodial parent." This latter section was part of the chapter providing for the enforcement of judgments, orders and decrees under the Family Law Act. It was enacted before, but took effect after, the decision in *Moffat, supra,* 27 Cal.3d 645. (Stats. 1980, ch. 237, § 1, p. 480; see *In re Marriage of Smith* (1989) 209 Cal.App.3d 196, 201 [257 Cal.Rptr. 47].) It is not discussed in *Moffat.*[2]

The cases construing these statutes assume that, although each uses slightly different language, the meaning of both is substantially identical, at least as regards the issue in this case. The parties do not suggest the statutes have different meanings. We doubt that the Legislature intended different rules to apply to proceedings under RURESA (now URESA) and the Family Law Act. The statutory language does not compel such a conclusion. We therefore construe the statutes as identical for purposes of this issue.

In *Moffat, supra,* 27 Cal.3d 645, the custodial mother had "obdurately refused to comply with the visitation order and ha[d] thus denied the children their right to know and to be with their father." (*Id.* at p. 650.) Because of the mandate of Code of Civil Procedure former section 1694, we held that this circumstance did not provide a defense to the obligation to pay child support. We emphasized we did not approve of the custodial parent's conduct, but concluded that "in such circumstances the child's need for sustenance must be the paramount consideration." (27 Cal.3d at p. 651.)

---

has not been briefed in this court (see Cal. Rules of Court, rule 29.3(c)) and, given the limited nature of the issue we are reviewing, is not now before us.

[2]In 1992, both Code of Civil Procedure section 1694 and Civil Code section 4382 were repealed and made part of the new Family Code, operative January 1, 1994. (Stats. 1992, ch. 162, §§ 3, 6; see new Fam. Code, §§ 4845, 3556.) The Revised Uniform Reciprocal Enforcement of Support Act (RURESA) has been renamed the Uniform Reciprocal Enforcement of Support Act (URESA) for consistency with the usage of the National Conference of Commissioners on Uniform State Laws. (Fam. Code, § 4800, and the Law Revision Commission Comments thereto.)

We noted, however, that although "RURESA provides no forum for litigating disputes over interference with custody and visitation rights, a noncustodial parent in the position of Mr. Moffat is not bereft of remedy. Such rights are initially determined by the superior court, acting under authority of the Family Law Act. (Civ. Code, § 4351.) Thus the parent whose rights are in jeopardy may seek enforcement of the judgment, order, or decree in the rendering court. (*Id.*, § 4380.)" (*Moffat, supra,* 27 Cal.3d at pp. 651-652.) We listed "several appropriate sanctions when the custodial parent acts with an intent to frustrate or destroy visitation rights," including contempt proceedings, terminating or reducing spousal support, modifying custody or child support orders, and requiring a bond to assure compliance with the visitation order. (*Id.* at p. 652.) But as regards the noncustodial parent's obligation to continue to pay child support, we concluded that "by her misconduct alone in depriving the father of his visitation rights, [the custodial parent] is not estopped from pursuing the enforcement of child support under RURESA." (*Ibid.*; see also *id.* at p. 659 ["section 1694 bars the assertion of interference with visitation rights as a defense in a RURESA proceeding in which the duty of support is being determined"].)

Father does not challenge the holding of *Moffat,* but argues that it does not apply when the custodial parent engages in active concealment. The Court of Appeal here agreed: "A distinction has been recognized, however, between mere *interference* with visitation rights by the custodial parent, which the controlling statutes expressly foreclose as a defense to enforcement of a child support order, and active *concealment* of the child, which falls outside the purview of sections 1694 and 4382. (*In re Marriage of Smith* (1989) 209 Cal.App.3d 196, 201-202 [257 Cal.Rptr. 47]; *State of Washington* ex rel. *Burton* v. *Leyser* (1987) 196 Cal.App.3d 451, 457 [241 Cal.Rptr. 812] (hereafter *Leyser*); *In re Marriage of Kelley* [1986] 186 Cal.App.3d 613, 618-619 [231 Cal.Rptr. 6]; *Solberg* v. *Wenker* (1985) 163 Cal.App.3d 475, 478 [209 Cal.Rptr. 545]; *In re Marriage of Daves* (1982) 136 Cal.App.3d 7, 10 [185 Cal.Rptr. 770].) We are persuaded that the distinction is a valid one, based upon the statutory language and rationale underlying the legislation.

"Sections 1694 and 4382 specifically provide that the child support obligation is not extinguished by the custodial parent's 'interference' with or 'refusal . . . to implement' visitation granted by the court, conduct which we do not equate with deliberate 'sabotage' of visitation rights by concealment of the child. (*In re Marriage of Smith, supra,* 209 Cal.App.3d at p. 201; *Solberg* v. *Wenker, supra,* 163 Cal.App.3d at p. 458.) Thus, we find nothing in the language of the statutes which expressly prohibits an estoppel defense to an action for collection of child support arrearages based upon active concealment of the child. Had the Legislature intended to grant an exemption from equitable defenses to conduct which so subverts the parent-child

relationship, we believe the terms 'interference' with and 'refusal . . . to implement' visitation rights would have been replaced with much more encompassing language.

"We are also convinced that the primary objective of the statutes—that is, the child's sustenance and welfare—cannot be served where the custodial parent seeks an award of arrearages after the child has been concealed until reaching the age of majority. [Fn. omitted.] (*In re Marriage of Smith, supra,* 209 Cal.App.3d at pp. 202-203; *Leyser, supra,* 196 Cal.App.3d at p. 458.) In such a case, reimbursement to the custodial parent will not cognizably advance the child's welfare. (*Ibid.*) We see no reason to reward a custodial parent who has concealed the whereabouts of a child, and thereby denied the values inherent in a congenial parent-child relationship, with a belated award of support arrearages which will be of no tangible benefit to the child. (*Moffat, supra,* 27 Cal.3d at p. 658.) The welfare of a child 'transcends material considerations. . . . Visitation rights are a two-way street: although technically awarded by a court to a parent, the rights belong equally to the children. Thus the Legislature and our courts alike have declared an abiding parental relationship to be in the best interests of the child. [Citations.]' (*Ibid.*; see also *In re Marriage of Smith, supra,* 209 Cal.App.3d at pp. 202-203; *Leyser, supra,* 196 Cal.App.3d at p. 457.) Without a clear and convincing directive from the Legislature, we decline to permit a custodial parent to undermine the parent-child relationship by active concealment of the child—which we view as an implicit election to raise the child without financial assistance from the noncustodial parent—with no disruption of the corollary right to reimbursement for child support arrearages. And finally, while a noncustodial parent who has suffered mere interference with visitation rights has several feasible alternative remedies—i.e., an order of contempt, an order terminating or reducing spousal support, an order changing custody, or a bond to assure compliance with visitation orders—the case is otherwise where the custodial spouse has engaged in purposeful concealment. In such circumstances, the noncustodial spouse has no practical means of employing these remedies and may have no recourse other than to claim concealment as a defense to collection of child support arrearages. (*Id.* at p. 459; *Solberg* v. *Wenker, supra,* 163 Cal.App.3d at p. 480.)" (Italics in original.)

In *State of Washington* ex rel. *Burton* v. *Leyser* (1987) 196 Cal.App.3d 451 [241 Cal.Rptr. 812] (*Leyser*), cited by the Court of Appeal here, the mother concealed her whereabouts and that of the children who were the subject of a child support order for several years, until the 2 children were 12 or 13 and 17 years old, respectively. The trial court refused to order the father to pay arrearages for the period of the concealment. The Court of Appeal affirmed.

It expressly found it "need not address the issue of whether . . . 'concealment' is a distinct defense to an action for child support arrearages under RURESA," holding instead that both waiver and estoppel were valid defenses. (*Id.* at p. 455.) The court "agree[d] the principal concern in litigating the right to current and future child support is the welfare of the child. However, when past unpaid support is the issue, the welfare of the child may not be involved. For example, in this case reimbursement to the mother will have no tangible effect on [the older child], whose location is unknown. Quite different considerations would be present if a public agency had provided support for the benefit of the children and was seeking reimbursement. A public agency cannot be estopped because of the conduct of the parents. (*In re Marriage of Kelley* (1986) 186 Cal.App.3d 613, 620-621 [231 Cal.Rptr. 6].) Also, if the *ongoing* support of the child is at issue, our high court in *Moffat* and the Legislature by its enactments on the subject, have made it clear the *child's* right to sustenance must remain free of the disputes or express or implied agreements of the parents." (*Id.* at p. 457, italics in original.)

The *Leyser* court thus found "a proper distinction between ongoing interference with visitation which is subject to litigation and relief, and past conduct amounting to waiver and/or estoppel of prior support." (*Leyser, supra,* 196 Cal.App.3d at p. 458.) "Waiver is the intentional relinquishment of a known right. [Citation.] . . . 'To constitute waiver, it is essential that there be an existing right, benefit, or advantage, a knowledge, actual or constructive, of its existence, and an actual intention to relinquish it or conduct so inconsistent with the intent to enforce the right in question as to induce a reasonable belief that it has been relinquished.' [Citation.] [¶] Estoppel by conduct is very similar and is found when one person intentionally and deliberately leads another to believe that a particular thing is true and to act upon such belief. [Citations.] [¶] . . . [I]t was not unreasonable for the trial court to conclude [the mother's] conduct was inconsistent with her right to reimbursement for sums she expended to support the children during that time. Nor was it unreasonable to conclude she induced [the father] to believe she would not claim child support for that period of time." (*Id.* at p. 460; see also *In re Marriage of McLucas* (1989) 210 Cal.App.3d 83 [258 Cal.Rptr. 133].)

A different view was taken in *In re Marriage of King* (1993) 16 Cal.App.4th 1250 [20 Cal.Rptr.2d 486]. There, the noncustodial father did not know where the children were for three months one summer while the children were still minors. Expressly disagreeing with the Court of Appeal in this case and *Solberg* v. *Wenker* (1985) 163 Cal.App.3d 475 [209 Cal.Rptr. 545], the court held that "a noncustodial parent's ignorance of the whereabouts of his children is not a defense to the obligaton to pay child support

arrears even where the ignorance stems from the custodial parent's conceal-ment of the children." *(In re Marriage of King, supra,* 16 Cal.App.4th at p. 1251.) The court reasoned, "First, Civil Code section 4382 is not ambiguous. [Fn. omitted.] The statute directs that enforcement of child support 'shall not be affected by a failure or refusal . . . to implement . . . custody or visitation [rights] . . . .' There can be no doubt that child concealment is encompassed within the broad concept of a failure or refusal to implement custody or visitation rights. (Civ. Code, § 3536 ['The greater contains the less.'].) That child concealment could be called deliberate sabotage of visitation rights does not alter this fact. At most, child concealment is an aggravated form rather than a concept outside the definition of failure or refusal to implement. In short, the Legislature's statement of the law is clear and unconditional. It does not except aggravated forms of failures or refusals to implement custody or visitation rights from its directive. *(In re Marriage of Tibbett* [(1990) 218 Cal.App.3d 1249, 1254 (267 Cal.Rptr. 642)].)

"Second, '*Solberg* relies on suspect authority—cases that predate [Civil Code section 4382] as well as cases that do not discuss th[is] relevant authorit[y].' *(In re Marriage of Tibbett, supra,* 218 Cal.App.3d at p. 1253.)

" 'The Supreme Court has held that the Legislature intended to separate support and visitation rights—that a custodial parent's misconduct cannot estop that parent from asserting a child's support rights. [Citation.] Regard-less of whether the custodial parent actually conceals the children from the noncustodial parent or merely interferes with their visitation, these authori-ties apply with equal force. While we do not condone any custodial parent's deprivation of the visitation rights of a noncustodial parent, we find that concealment does not constitute a defense to [a proceeding to determine child support arrears.]' *(In re Marriage of Tibbett, supra,* 218 Cal.App.3d at p. 1254.)" *(In re Marriage of King, supra,* 16 Cal.App.4th at pp. 1253-1254; see also *In re Marriage of Tibbett* (1990) 218 Cal.App.3d 1249 [267 Cal.Rptr. 642] [no defense that mother concealed the children for several years ending when the children were still minors]; and *Puig* v. *Ryberg* (1991) 230 Cal.App.3d 141, 144 [283 Cal.Rptr. 604] [dicta indicating agreement with *Tibbett*].)[3]

We agree with the result the Court of Appeal reached in this case, although for somewhat different reasons. Concealment of the custodial

---

[3]We have reviewed out-of-state authority and find it inconclusive. In *State* ex rel. *Southwell* v. *Chamberland* (Minn. 1985) 361 N.W.2d 814, the court refused to recognize a concealment defense. But there the concealment was for a far shorter period of time than here, a governmental entity was seeking the arrearages, and the court did not consider an estoppel argument. Closest on point is *State* ex rel. *Blakeslee* v. *Horton* (1986) 222 Mont. 351 [722 P.2d 1148] where both parties agreed each would stay out of the other's life despite a court order requiring father to pay child support. Fourteen years later, mother sought the arrearages. In effect adopting an estoppel defense, the court held that the mother should not be allowed

parent and child from the noncustodial parent until the child is an adult interferes in an extreme manner with visitation rights. To the extent it does only that, however, it arguably is but a species of interference within the meaning of Code of Civil Procedure former section 1694 (now Fam. Code, § 4845) and Civil Code former section 4382 (now Fam. Code, § 3556), which interference does not prevent enforcement of the child support order. Therefore, unlike the Court of Appeal, we do not rely on that aspect of concealment in finding estoppel.

But such concealment does much more. It effectively precludes the non-custodial parent from invoking or benefitting from the remedies for inter-ference that we identified in *Moffat, supra,* 27 Cal.3d at page 652, and *precludes the very child support payments that the custodial parent later seeks to collect.* One cannot make child support payments to a person who cannot be located. Concealment thus defeats the entire purpose of the order, which is to provide support to a third party, the child. In finding an estoppel defense under these facts, we rely on the unfairness of enforcing a judgment against a person who had no clear way of paying the monthly obligation because the custodial parent had gone into hiding. It is unfair to let the parent hide during the term of the obligation—usually a lengthy term—and then reappear and demand payment of arrearages in full after he or she has defeated the purpose of the judgment. If the Legislature had intended to make child support obligations unaffected by such concealment, i.e., by conduct making impossible the child support payments themselves, it could have and surely would have used more expansive language than it did.

This conclusion is bolstered by the fact the Legislature has recently recognized the possible validity of an estoppel defense to the enforcement of child support orders. Welfare and Institutions Code section 11350.6, enacted in 1992, concerns enforcement of child support obligations. Subdivision (a)(5) of that section defines the term " '[c]ompliance with a judgment or order for support' " as including the situation when the obligor "has obtained a judicial finding that *equitable estoppel as provided in statute or case law* precludes enforcement of the order." (Italics added.) The Attorney General suggests this merely recognized "the vagaries of sister-state judgments which may be based on equitable defenses which are not available in California, but which must be accorded full faith and credit." Nothing in the statute, however, suggests it is limited to out-of-state judgments.

to participate in the nullification of the law, then later claim the benefit. "Although legally the mother may have been correct in her claim for child support, equity demands that her claim must fail." (*Id.* at p. 1151.) Mother's *unilateral* actions in this case, if proven, compel a similar result. The other cases cited by Justice Baxter in his dissenting opinion generally only reiterate the California rule stated in *Moffat, supra,* 27 Cal.3d 645, which we do not question, or are even further removed from the issue here.

The Attorney General argues on behalf of mother that father, and any noncustodial parent, is not entirely helpless against attempts to conceal a child. A noncustodial parent may, for example, make use of the services of the district attorney and the California Parent Locator Service in an attempt to locate the missing parent. (See Welf. & Inst. Code, § 11478.5; *Leyser, supra*, 196 Cal.App.3d at p. 459.) Any such attempt may or may not succeed, depending on how successful the custodial parent is in the concealment effort. If it succeeds, then obviously the concealment would end, thus mooting the point at least prospectively, although such success could not remedy the effects of past concealment and the inability to make the support payments during the period of concealment. If it fails, the availability of this assistance would clearly be no remedy at all.

■ Whether father acted with reasonable diligence in this case, or simply gave up after encountering the first difficulty in finding the child, is a factual question for the trial court to decide. (*Leyser, supra*, 196 Cal.App.3d at p. 459.) ■ But if mother did in fact conceal herself and the child, thus preventing the payments, she should not now be heard to claim that father did not make herculean efforts to stymie her, and must therefore pay her for all the years she prevented the child from receiving the support. "[P]ractical difficulties arise when one party is making purposeful efforts to 'hide.' " (*Ibid.*) "Appellant cannot play hide-and-seek with respondent and then recover support payments for that period of time during which she successfully kept her whereabouts unknown to him." (*Szamocki* v. *Szamocki* (1975) 47 Cal.App.3d 812, 819 [121 Cal.Rptr. 231], quoted in *Solberg* v. *Wenker, supra*, 163 Cal.App.3d at p. 480.)

The noncustodial parent who could not find the child and custodial parent could conceivably move in court for a modification of the child support order. Assuming the concealment was successful, such a motion would necessarily be heard without actual notice to the custodial parent. We need not decide whether a trial court would or should modify a support order under such circumstances, for we believe that, although the parent under court order to pay support should always turn to the court for aid when the judgment creditor has made the payments impossible, rather than relying on self-help, we focus on the conduct of the custodial parent in finding estoppel. The custodial parent should not be allowed to make the payments impossible, then seek arreareages after the purpose of the judgment, payment of support for the benefit of the *child*, has been defeated.

Of course, as noted in *Leyser, supra*, 196 Cal.App.3d at page 457, when the noncustodial parent does locate the other parent and child, any prior concealment would not affect a *continuing* obligation to pay child support.

Here, however, father has no ongoing obligation since the child reached the age of majority before the concealment ended.

The Attorney General also argues that the actions of one parent should not diminish the *child's* right to support. We agree in the abstract, but that is not now at issue. Mother's actions, assuming for the moment the truth of father's as yet unproven allegations, already have deprived the child of the father's support. Indeed, the child for whose support mother seeks the arrearages is now 35 years old. Mother is seeking payment of the arrearages to *herself*, not to the child. The harm mother did to the child by denying it father's companionship and financial support should not now entitle her to arrearages, many years later, that can no longer benefit the child.

We thus conclude that a custodial parent who actively conceals him- or herself and the child from the noncustodial parent until the child reaches the age of majority, despite reasonably diligent efforts by the noncustodial parent to locate them, is estopped from later collecting child support arrearages for the time of the concealment. Because it is the inability to make the support payments that distinguishes concealment from mere interference, the concealment, to be a defense, must be of both the custodial parent and the child. We disapprove of decisions by the Courts of Appeal to the extent they are inconsistent with this conclusion.

This case involves alleged concealment until the child reached the age of majority. Therefore, we cannot, and do not, express an opinion on the rule when the concealment ends while the child is still a minor and might yet benefit from payment of the arrearages. Because estoppel is an equitable defense, the equities might be different if the concealment were for a shorter time, especially if the innocent child particularly needed the arrearages. This case also does not involve public assistance payments or the assignment of child support rights to a county or other governmental entity, and we therefore do not decide any questions related to those circumstances. (Cf. *In re Marriage of Smith, supra,* 209 Cal.App.3d 196, with *Leyser, supra,* 196 Cal.App.3d at p. 457, and *In re Marriage of Kelley* (1986) 186 Cal.App.3d 613, 619-621 [231 Cal.Rptr. 6].)

We also emphasize, as did the Court of Appeal, that we are ruling only on the relevance, not the credibility, of father's allegations, which are disputed. The facts will have to be determined by the trial court on remand.

CONCLUSION

The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Mosk, J., George, J., and Boren, J.,* concurred.

**KENNARD, J.,** Concurring.—The majority opinion ignores a significant portion of the procedural history of this case. When the full history is examined, we find that the present action is not one to determine child support arrearages, but an action to establish and enforce a previous judgment that has long since become final. To successfully resist enforcement of this final judgment, Ronald Damico (father) must establish not only that he has a valid defense on the merits, but also that there are equitable grounds to set aside the final judgment, and that he has acted with diligence in seeking relief.

The record shows that Mary Damico Austin (mother) obtained an order and judgment for child support in 1960. In 1978, mother commenced proceedings to collect past due installments of child support by personally serving father with a notice that she was seeking arrearages for the years 1960 to 1978. In June 1980, after father had failed to appear at a hearing on mother's application, the superior court granted judgment against father for over $23,000. In April 1990, mother renewed this judgment. (See Code Civ. Proc., § 683.110 et seq.) With accrued interest, the judgment amount upon renewal was over $34,000. All these proceedings took place in the City and County of San Francisco.

In January 1991, the district attorney for Marin County, acting on mother's behalf, filed a "Statement for Registration of Foreign Support Order" in the superior court of that county, seeking registration of the 1960 support order and judgment, the 1980 judgment for arrearages, and the 1990 renewed judgment for arrearages. In response, father moved to vacate the registration and to deny enforcement of the support judgments. In support of the latter request, father submitted a declaration stating, among other things, that in 1979, after being served with the notice that mother had applied for child support arrearages, he had retained an attorney to represent him and had then "moved to Arizona believing that this matter had been taken care of by that attorney."[1] Father also tendered a defense on the merits, as explained in the majority opinion.

---

*Presiding Justice, Court of Appeal, Second Appellate District, Division Two, assigned by the Acting Chairperson of the Judicial Council.

[1]Father signed this declaration in the name of Kenneth P. Ali, a name father appears to have assumed when he moved to Arizona.

Mother submitted declarations stating, among other things, that she had first sought a determination of arrearages in August of 1978. Father retained counsel, and depositions were scheduled for November 1978, but the depositions were canceled when father retained new counsel who requested additional time to prepare. In February 1979, father's attorney conveyed a settlement offer of $1,800. The attorney represented that father had left the state and was experiencing financial difficulties. Mother rejected the settlement offer. Her attorney attempted to get new deposition dates, but none was ever set. On June 2, 1980, mother filed an amended notice of motion to determine arrearages, serving the motion on father's attorney. The attorney informed mother's counsel that he was trying to contact father to determine whether father still wished the attorney to represent him. At this attorney's request, mother rescheduled the hearing from June 13 to June 20. On June 17, the attorney conveyed a new settlement offer from father in the amount of $2,500. Mother rejected the offer. On June 19, the day before the scheduled hearing, the attorney told mother's counsel that father had not retained him and that he did not think father would be appearing at the hearing. Father did not appear on June 20, and the court granted judgment for mother in the amount she had requested. On June 23, mother served father with the notice of entry of judgment by mailing a copy to a post office box in Scottsdale, Arizona, that she believed father was using, and by mailing additional copies to his parents, his sister, and both of the attorneys who had represented him.

Father offered no additional declarations or other evidence to dispute the facts as stated in mother's declarations.

The trial court rejected all father's tendered defenses as legally irrelevant and ordered father to pay the support arrearages. The Court of Appeal reversed. This court granted review.[2]

The 1980 judgment converted the unpaid installments of child support into a lump-sum obligation. In the proceeding leading to that judgment, father

[2]In a footnote, the majority defends its decision to ignore the legal effect of the 1980 and 1990 judgments. (Maj. opn., *ante*, p. 677, fn. 1.) According to the majority, the Court of Appeal "rejected mother's argument that the default judgment precluded raising the concealment defense at this time[,]" but the majority declines comment on this ruling because "the viability of the concealment defense" was "the only issue raised in the petition for review" and the only issue on which this court granted review. (*Ibid.*)

The majority's view of the issue before this court is too narrow. This court's review includes not only the issue specified in the petition for review, but also "every subsidiary issue fairly included in it." (Cal. Rules of Court, rule 28(e)(2).) Thus, threshold issues concerning mootness, standing, jurisdiction, scope of review, and the like are always necessarily included within our scope of review. Because the viability of the concealment defense in this case cannot be separated from the procedural context in which father seeks to assert it,

could and should have presented any defenses he had to justify nonpayment of the individual installments. Accordingly, the judgment necessarily determined that father has no defense on the merits. The judgment's resolution of this issue is res judicata and must be accepted by the courts of Marin County, and by this court, unless and until father establishes legally sufficient grounds to vacate or set aside the 1980 judgment and the 1990 renewal of that judgment. (See *Pratali* v. *Gates* (1992) 4 Cal.App.4th 632, 644 [5 Cal.Rptr.2d 733] ["In an action on the judgment, the only relevant question is whether the judgment has been satisfied or remains unpaid."].)

To have a final judgment set aside, a party must show more than a mere error in the judgment or the absence of a full trial on the merits. "[P]ublic policy requires that only in exceptional circumstances should the consequences of res judicata be denied to a valid judgment." (Rest., Judgments, § 118, com. a, p. 571; see also Rest.2d Judgments, § 70, com. a, p. 180.) A court will enforce a judgment, without examining its legal or factual merits, unless a party establishes grounds for relief by one of the procedures provided for that purpose. (8 Witkin, Cal. Procedure (3d ed. 1985) Attack on Judgment in Trial Court, § 1, p. 403.)

After the time for ordinary direct attack has passed (see Code Civ. Proc., § 473 [allowing up to six months to challenge a judgment entered through the moving party's mistake, inadvertence, surprise, or excusable neglect]), a party may obtain relief from an erroneous judgment by establishing that it was entered through extrinsic fraud or mistake. (*In re Marriage of Park* (1980) 27 Cal.3d 337, 342 [165 Cal.Rptr. 792, 612 P.2d 882]; *Olivera* v. *Grace* (1942) 19 Cal.2d 570, 575 [122 P.2d 564, 140 A.L.R. 1328].) To warrant relief on this ground, the moving party must establish: (1) facts constituting extrinsic fraud or mistake; (2) a substantial defense on the merits; and (3) diligence in seeking relief from the adverse judgment.

The negligence of an attorney retained to handle a matter may constitute extrinsic mistake. (*Hallett* v. *Slaughter* (1943) 22 Cal.2d 552, 556-557 [140 P.2d 3]; see *Kulchar* v. *Kulchar* (1969) 1 Cal.3d 467, 471-472 [82 Cal.Rptr. 489, 462 P.2d 17, 39 A.L.R.3d 1368]; 8 Witkin, *op. cit. supra*, Attack on Judgment in Trial Court, §§ 214-215, pp. 617-620.) Here, father's allegations—that he retained an attorney to handle the matter and had assumed it was taken care of—may, if proved, be sufficient to establish extrinsic mistake, although mother's declarations seem to indicate that no attorney negligence was involved and that father had no reasonable basis for believing that the matter had been taken care of. Relief must be denied if the party

the effect of the 1980 and 1990 judgments is "fairly included" in the issue on which this court granted review and thus properly before this court.

seeking relief was guilty of negligence in permitting the mistake to occur. (*Kulchar* v. *Kulchar, supra*, at p. 473.) As the parties' allegations have not been subjected to the test of an adversary hearing, it is not possible for an appellate court to determine on the present record whether father can establish extrinsic fraud or mistake.

In addition to establishing facts constituting extrinsic fraud or mistake, father must demonstrate probable error in the final judgments from which he seeks relief. He must show, in other words, "facts indicating a sufficiently meritorious claim to entitle [him] to a fair adversary hearing." (*In re Marriage of Park, supra*, 27 Cal.3d 337, 346; see also *Bennett* v. *Hibernia Bank* (1956) 47 Cal.2d 540, 554 [305 P.2d 20].) I agree with the majority that father's allegations of mother's active concealment, making it practically impossible for father to pay the child support installments as they fell due, are relevant to establish a defense of estoppel or waiver.[3] Again, however, the relevant facts are disputed and the present record is inadequate to determine whether father has a valid defense on the merits.

---

[3]Because the defense of estoppel is equitable in nature, the trial court should consider all relevant circumstances, including any circumstances that might tend to justify or excuse, in whole or in part, the custodial parent's concealment. Mother's declaration contains factual allegations that would be pertinent for this purpose. For example, she states that in August 19, 1958, while the divorce proceeding was pending, father was ordered to pay $75 per month as temporary child support. Although fully aware of mother's whereabouts, father made no effort to comply with the child support order and visited his son only three times in the nine months following the child's birth. The interlocutory judgment entered on May 19, 1959, included $698.50 in child support arrearages under the interim order, and it required that father pay child support thereafter in the amount of $50 per month. In September 1959, father was adjudged in contempt for failure to pay child support and sentenced to jail for five days. Despite this sanction, he still did not pay support. In February 1960, father gave mother a check for $50, but "it did not clear his bank." After father was released from jail, he telephoned mother and told her he would "take [their] son away from [her] and [she] would never see him again," and also that he "would move to Mexico where [she] would not find him if [she] did not leave him alone." Mother took this threat seriously and thereafter "always took great efforts never to let [the child] be alone." Mother knew that father's mother is a native of Mexico and had funds to help father relocate to that country. On another occasion, in early 1961, father asked mother "not to bother him for a few years while he attended school," and he told her "that he expected to get an inheritance when he became 35 years old . . . and that he would pay child support then." (Elsewhere mother alleges that father was 19 years old in 1958. If so, he would not have been 35 until 1974, just 4 years before mother commenced her collection efforts.)

If the trial court finds that mother intentionally concealed her whereabouts from father, it should also consider the truth of mother's allegations that father had a history of not paying child support, that he had threatened to abduct the child, and that he had asked mother to defer enforcement of the support obligation until he turned 35 in 1974. Nothing in the majority opinion suggests that facts such as these would be irrelevant to the court's exercise of its equitable powers.

Finally, father must demonstrate that he has proceeded with diligence to obtain relief from the 1980 and 1990 judgments. Courts require that a party seek relief as soon as reasonably possible after learning of an adverse judgment. (See *In re Marriage of Park, supra*, 27 Cal.3d 337, 345-346; *Stiles* v. *Wallis* (1983) 147 Cal.App.3d 1143, 1150 [195 Cal.Rptr. 377]; *In re Marriage of Wipson* (1980) 113 Cal.App.3d 136, 144 [169 Cal.Rptr. 664]; *Alexander* v. *Abbey of the Chimes* (1980) 104 Cal.App.3d 39, 48 [163 Cal.Rptr. 377].) Here, father's declaration does not reveal when he became aware of the 1980 and 1990 judgments. Mother's evidence indicates that she attempted to serve him by mail with the 1980 judgment, but the success of this effort presents a factual question. As with the other requirements for equitable relief, due diligence will be an issue for the parties to litigate in the trial court.

Upon remand, the trial court should determine whether the previous judgment was the result of extrinsic mistake, whether father has a substantial defense on the merits, and whether father has exercised diligence in moving for relief from the 1980 and 1990 final judgments. With the understanding that the trial court will undertake these factual determinations and proceed accordingly, I concur in the majority opinion.

**BAXTER, J.**—I respectfully dissent.

The majority sanction disobedience of court orders and ignore the limited scope of a proceeding brought under the Revised Uniform Reciprocal Enforcement of Support Act (RURESA). The holding encourages parents who are subject to child support orders to become scofflaws. It threatens disruption of existing national uniform procedures by which child support orders are enforced. Moreover, it ignores the Legislature's express limitation on the power of a court to relieve a parent from an obligation to pay arrearages.

The result is all the more unfortunate because it is completely unnecessary. The question of whether an estoppel against an action for arrearages should be recognized arises only because the nonsupporting parent failed to avail himself or herself of readily available procedures whereby he or she could be relieved judicially of the support obligation if, in fact, the child has been concealed by the custodial parent.

The majority acknowledge, but apparently find little significance in them for this case, the services available to a parent who believes a child is being concealed. If those services have been used, however, and the whereabouts

of the child remain unknown, surely the removal and concealment of the child are grounds for judicial modification or termination of the support obligation, either because the custodial parent is in contempt of court (see *White* v. *White* (1945) 71 Cal.App.2d 390 [163 P.2d 89]) or on the ground that the child's circumstances and needs are then unknown. A parent who attempts to locate the child through officially available resources and seeks judicial relief from the support obligation demonstrates respect for the law as well as a sincere concern for the child and the parental obligation to the child. The parent whom the majority reward did neither, but is nonetheless relieved of the support obligation for the purpose of punishing the alleged misconduct of the custodial parent.

I

*Remedies of a Noncustodial Parent*

The misconduct of a custodial parent who conceals a child and thereby interferes with the custody and/or visitation rights of the other parent is not justification for violating a court order to pay support for the child. The supporting parent who is sincerely interested in locating, maintaining family ties with, and supporting the child may enlist the state's help in finding the child.

When a parent violates a custody or visitation decree by taking or detaining the child, Family Code section 3131 (Civ. Code, former § 4604, subd. (b)),[1] imposes a mandatory duty on the district attorney to "take all actions necessary to locate and return the child and the person who violated the order and to assist in the enforcement of the custody or visitation order or other order of the court by use of an appropriate civil or criminal proceeding." In doing so, the district attorney acts on behalf of the court (§ 3132; Civ. Code, former § 4604, subd. (c)) at no cost to the parent. Education Code section 49076 makes school records and forwarding requests available, and the district attorney has access to postal, utility company, and other governmental records, as well as tax returns. A parent has no excuse for discontinuing support payments because a child's whereabouts are unknown when this locator service is available.

Nor is it an excuse that the parent does not know where to send the payments even if that inability is caused by the custodial parent's "active

---

[1]Further statutory references are to the Family Code unless otherwise indicated.

concealment" of the child.[2] If a parent has made use of the district attorney's locator service and the child cannot be located, relief is available from the court that made the support order. Section 3680 et seq. (Civ. Code, former §§ 4700.1, 4801.9, subd. (a)) offer the parent a simplified means by which to obtain modification of a support order. The simplified procedures were adopted to create a "relatively quick way to modify child support awards" in a proceeding at which neither party need engage an attorney. (*In re Marriage of Moore* (1986) 185 Cal.App.3d 1244 [230 Cal.Rptr. 311].) The whereabouts of the custodial parent need not be known in order to take advantage of those procedures. Each party to the support order is required to advise the other of the party's address and any subsequent change of address. (§ 3681.) Service of a request for modification may be made by certified mail at the last known address of the custodial parent. (§ 3690.) A parent may not claim ignorance of the right to seek modification or of the simplified procedures, since section 4010 mandates that a support order be accompanied by written notice of the procedure by which to obtain modification.

By creating an estoppel to seek accrued unpaid support, the majority excuse the failure of the obligor to seek modification or termination of the support obligation and sanction disobedience of a court order for support whenever a parent believes that the custodial parent is "actively" concealing the child. The majority thereby abolish a vested property right (see *In re Marriage of Everett* (1990) 220 Cal.App.3d 846, 854 [269 Cal.Rptr. 917] ["Accrued arrearages are treated like a money judgment, each payment having become due under an extant judgment or order."], and by doing so relieve the parent of responsibility for accrued child support notwithstanding an express legislative limitation on the power of the court to forgive arrearages even in cases in which the parent has sought modification or termination of the obligation. Section 3651, subdivision (b), prohibits such action, stating: "*A support order may not be modified or terminated as to an amount that accrued before the date of the filing of the notice of motion or order to show cause to modify or terminate.*" (Italics added; see also, Civ. Code, former § 4700, subd. (a).)

If the legislative intent that "active concealment" may not be offered as a defense in an action to collect arrearages in child support is not made sufficiently clear by section 3651, subdivision (b), it most certainly is in section 4612 (Civ. Code, former § 4701.1, subd. (a)(4)(A)-(I)), which states the grounds which may be used as a defense to a motion to force sale of the

---

[2]It is not clear to me how a parent who is unable to locate a child is able to determine that there has been "active concealment" or at which point concealment becomes or ceases to be "active."

obligor's assets to pay for arrearages. Those grounds do not include interference in any degree with custody and visitation.[3]

Moreover, neither the majority nor Justice Kennard attempts to reconcile the creation of an estoppel applicable to an attempt to judicially enforce payment of arrearages with the right of an obligee to do so "without prior court approval" through use of a writ of execution. (§§ 5100, 5104.) That right exists as long as the support order remains enforceable, a period that is not affected by the child having reached majority. (§ 4503; Civ. Code, former § 4708.) It cannot have been the intent of the Legislature that, by invoking the aid of the court to enforce a support obligation, the obligee may be denied a right that could be attained without resort to the court if only the obligor had readily available assets.

As a result of the majority holding, a contemptuous scofflaw who simply disregards a court order to pay support is now in a better position than the parent who seeks judicial relief from the support obligation, and a parent who must use the court process to enforce payment of arrearages is worse off than one who can simply execute on the assets of the debtor. I cannot join an opinion which demonstrates such cavalier disregard for valid judgments and statutes.

II

*RURESA Considerations*

In addition to its disregard for the statutory limitation on a court's power to relieve a parent from the obligation to pay accrued arrearages, the majority ignores the limited scope of a RURESA enforcement proceeding.

This action was brought under the procedures made available by RURESA to persons owed support. The real issue in this case is not,

---

[3]Section 4612: "An obligor-parent alleged to be in arrears may use any of the following grounds as a defense to the motion [for deposit of assets] or as a basis for filing a motion to stop a sale or use of assets under section 4631:
"(a) Child support payments are not in arrears.
"(b) Laches.
"(c) There has been a change in the custody of the children.
"(d) There is a pending motion for reduction in support due to a reduction in income.
"(e) Illness or disability.
"(f) Unemployment.
"(g) Serious adverse impact on the immediate family of the obligor-parent residing with the obligor-parent that outweighs the impact of denial of the motion or stopping the sale on obligee.
"(h) Serious impairment of the ability of the obligor-parent to generate income.
"(i) Other emergency conditions."

therefore, whether the court may or should recognize concealment of a child as a defense to a parent's support obligation, but whether that defense may be raised in a RURESA action.

The majority concludes that questions related to visitation and custody may be litigated in a proceeding initiated under former section 1694 of the Code of Civil Procedure (see now § 4845), but that statute is part of a uniform act which does not permit those questions to be raised regardless of whether there has been "active" or, for that matter, passive concealment of a child. Section 4845 is a RURESA provision, and is part of the uniform act as adopted in California. (§ 4820 et seq.; Code Civ. Proc., former § 1670 et seq.)

The proposed holding is contrary to the view of the overwhelming majority of courts in states that have adopted RURESA that custody and visitation issues may not be raised in a proceeding to enforce payment of arrearages. (See, e.g., *Barnes* v. *State* ex rel. *State of Va.* (Ala.Civ.App. 1990) 558 So.2d 948; *Ibach* v. *Ibach* (1979) 123 Ariz. 507 [600 P.2d 1370]; *Kline* v. *Kline* (1976) 260 Ark. 550 [542 S.W.2d 499]; *People* ex rel. *Van Meveren* v. *District Court in and for Larimer County* (Colo. 1982) 638 P.2d 1371; *County of Clearwater, Minnesota* v. *Petrash* (1979) 198 Colo. 231 [598 P.2d 138]; *State* ex rel. *Rock* v. *Rock.* (Fla.Dist.Ct.App. 1983) 429 So.2d 1351; *Vecellio* v. *Vecellio* (Fla.Dist.Ct.App. 1975) 313 So.2d 61; *Rathmell* v. *Gardner* (1982) 105 Ill.App.3d 986 [61 Ill.Dec. 559, 434 N.E.2d 1156]; *People* ex rel. *Argo* v. *Henderson* (1981) 97 Ill.App.3d 425 [422 N.E.2d 1005]; *In re Marriage of Truax* (Ind.Ct.App. 1988) 522 N.E.2d 402; *Beneventi* v. *Beneventi* (Iowa 1971) 185 N.W.2d 219; *Patterson* v. *Patterson* (1978) 2 Kan.App.2d 447 [581 P.2d 824]; *Brown* v. *Turnbloom* (1979) 89 Mich.App. 162 [280 N.W.2d 473]; *State* ex rel. *Southwell* v. *Chamberland* (Minn. 1985) 361 N.W.2d 814; *England* v. *England* (Minn. 1983) 337 N.W.2d 681; *State* ex rel. *Dewyea* v. *Knapp* (1984) 208 Mont. 19 [674 P.2d 1104];[4] *Contra Costa County* ex rel. *Petersen* v. *Petersen* (1990) 234 Neb. 418 [451 N.W.2d 390]; *Monmouth County* v. *Lohman* (1989) 229 N.J.Super. 485 [551 A.2d 1051]; *Cahn* v. *Cahn* (1982) 117 Misc.2d 1054 [459 N.Y.S.2d 657]; *Pifer* v. *Pifer* (1976) 31 N.C.App. 486 [229 S.E.2d 700]; *Brown* v. *Brown* (1984) 16 Ohio App.3d 26 [474 N.E.2d 613]; *San Diego County* v. *Elavsky* (1979) 58 Ohio St.2d 81 [12 Ohio Op.3d, 388 N.E.2d 1229]; *State* ex rel. *State of Wash., Dept. of Social and Health Services* v. *Bozarth* (1986) 80 Ore.App.

---

[4]Montana recognized a visitation-related equitable defense in a RURESA action in *State* ex rel. *Blakeslee* v. *Horton* (1986) 222 Mont. 351 [722 P.2d 1148]. That case is easily distinguishable, however, on the basis that the defense was an agreement between the parents, made 14 years before the RURESA action and complied with by both parties, in which wife agreed not to enforce the support order and husband agreed not to attempt to enforce his visitation rights.

397 [722 P.2d 48]; *Myers* v. *Young* (1981) 285 Pa.Super. 254 [427 A.2d 209]; *Kramer* v. *Kelly* (1979) 265 Pa.Super. 58 [401 A.2d 799]; *Hoover* v. *Hoover* (1978) 271 S.C. 177 [246 S.E.2d 179]; *Todd* v. *Pochop* (S.D. 1985) 365 N.W.2d 559; *Cuccia* v. *Cuccia* (Tenn.Ct.App. 1989) 773 S.W.2d 928; *Charlesworth* v. *State of California* (Utah Ct.App. 1990) 793 P.2d 411; *Johns* v. *Johns* (1988) 5 Va.App. 494 [364 S.E.2d 775]; *State* ex rel. *Hubbard* v. *Hubbard* (1983) 110 Wis.2d 683 [329 N.W.2d 202].[5]

The courts in our sister states are firm in enforcing this rule, and in carrying out the intent of RURESA. "As we held in *State of Colorado ex rel. McDonnell* v. *McCutcheon*, 337 N.W.2d 645 (Minn.1983), under [the statute] deprivation of custody or visitation is not a proper factor to consider in determining or enforcing interstate support obligations." (*England* v. *England, supra,* 337 N.W.2d 681, 684.) "A defendant in a URESA action must raise visitation and custody matters in a separate proceeding in the state of divorce." (*Todd* v. *Pochop, supra,* 365 N.W.2d 559, 560.) "In the face of this legislative mandate, our courts have consistently ruled that the duty of support owed to children in a RURESA proceeding is not affected by interference with visitation rights. [Citations.] In the seminal case of *Daly* v. *Daly* [(1956) 21 N.J. 599, 123 A.2d 3], the Supreme Court held that the dereliction of the custodial parent did not abrogate the noncustodial parent's duty of support." (*Monmouth County* v. *Lohman, supra,* 551 A.2d 1051, 1053.)

Notwithstanding this well-established rule, and some 20 years after California adopted this provision of RURESA and thereby joined in a nationwide network of uniform procedure by which to enforce support orders, the majority suddenly finds in the legislation an exception to the statutory obligation of California courts to comply with an otherwise uniform law. In their eagerness to condemn parents who have, *allegedly*, denied the noncustodial parent visitation and custody rights, the majority appears to have lost sight of the goals of RURESA. The intent of the uniform act is that an enforcement proceeding will be a summary, expeditious proceeding at which the plaintiff need not litigate, and the court need not adjudicate, claims related to custody and visitation. (*Johns* v. *Johns, supra,* 364 S.E.2d 775; *Barnes* v. *State* ex rel. *State of Va., supra,* 558 So.2d 948.) "The very purpose of the URESA requires that it be procedurally and substantively streamlined. Interstate enforcement of support obligations will be impaired if matters of

---

[5]If the court in which the RURESA proceeding is pending is the court with continuing jurisdiction over the dissolution and/or custody proceedings, an interference with custody or visitation rights may be raised if notice is given that the issue is to be litigated. This is permitted only because jurisdiction exists independent of RURESA, however. (See *Watkins* v. *Springsteen* (1980) 102 Mich.App. 451 [301 N.W.2d 892, 895].)

custody, visitation, or a custodial parent's contempt are considered by the responding court. The introduction of such collateral issues will burden the efficiency of the URESA mechanism. Moreover, permitting the resolution of other family matters in a URESA proceeding may deter persons from invoking the URESA." (*Hubbard* v. *Hubbard, supra,* 329 N.W.2d 202, 205.)

"The purpose of RURESA is to create an economical and expedient means of enforcing support orders for parties located in different states." (*Johns* v. *Johns, supra,* 364 S.E.2d 775, 776.)

"[N]o issues other than support may be considered in a URESA action. . . . [M]ost jurisdictions hold that visitation interference is not a defense in a URESA action [citations] because courts lack subject matter jurisdiction under URESA to terminate or modify child support due to interference with visitation. *In re Marriage of Truax,* 522 N.E.2d 402, 405 (Ind.Ct.App.1988). URESA therefore limits the court's jurisdiction to 'the single issue of enforcement of support.' *Id.*

*"The rationale for the limited subject matter jurisdiction is the need for a streamlined mechanism to enforce support obligations without consideration of other issues which would cripple those enforcement efforts. Id."* (*Charlesworth* v. *State of California, supra,* 793 P.2d 411, 413, italics added.)

"URESA makes no mention of visitation matters. Its scope is expressly limited to support. The act contemplates *ex parte* proceedings where only duties of support are adjudicated. It does not provide for adversary proceedings where other matters are to be decided. . . . [¶] Since the Michigan statute contains no provision suggesting that an adversary proceeding was contemplated by the Legislature, we are convinced that a streamlined process focusing solely on the issue of support was intended. The lack of due process protections for the absent custodial parent compels this conclusion." (*Brown* v. *Turnbloom, supra,* 280 N.W.2d 473, 475.) "The purpose of the URESA is to improve and extend by reciprocal legislation the enforcement of duties of support. K.S.A. 23-451.The goal sought by this legislation is to provide a prompt, expeditious way of enforcing the duty to support minor children without getting the parties involved in other complex, collateral issues. The act specifically declares that the remedies therein provided are in addition to and not in substitution for any other remedies. [Citations.] Nothing in the act allows the adjudication of child custody or visitation privileges or other matters commonly determined in domestic relation cases." (*Patterson* v. *Patterson, supra,* 581 P.2d 824, 825.)

The unfortunate result of the majority holding is that any parent seeking to enforce a support order after the child reaches majority may instead have to

litigate, and the court will have to rule on, claims by nonsupporting parents that the plaintiff "actively" concealed the child. In addition, assuming they will do so at all, prosecutors in the responding state, on whom the obligation to represent the plaintiff in RURESA actions is imposed (see Code Civ. Proc., former § 1680; Fam. Code, § 4831; RURESA § 18), will be burdened with litigating an issue RURESA did not intend to impose on them.

The majority does not resolve the right to offer an "active concealment" defense when enforcement of a support order is sought during the minority of the child, and do not consider the impact of its holding on the rights of public agencies who have provided support to enforce assignments of the custodial parent's support rights. This temporarily avoids more difficult questions,[6] but the failure to face these issues adds uncertainty to what had been until now a relatively clear statutory and, in California as well as other jurisdictions, a vested right.[7] It also throws into confusion the rights of parents in other states who seek to utilize the provisions of RURESA to enforce support orders in California courts. Must they now travel to California to answer noncustodial parents' claims that the child was "actively" concealed?[8] Only time will answer this question or tell how the courts of other jurisdictions will treat enforcement actions brought in those courts by

---

[6]The question of assigned rights is particularly important since, as a condition of receiving federal aid for the Aid to Families with Dependent Children Program, a state must require the custodial parent "to assign the State any rights to support from any other person such applicant may have (i) in his own behalf or in behalf of any other family member for whom the applicant is applying for or receiving aid, and (ii) which have accrued at the time such assignment is executed; . . . ." (42 U.S.C. § 602(a)(26)(A).)

If the exception to enforcement rights created by the majority extends to the assignee, as would be the case in most assignments, since an assignor may not assign any greater rights than he or she has, the impact of the holding proposed by the majority could be to take California out of compliance with the Social Security Act and endanger grant in aid funds now being provided by the federal government.

Additionally, if a county furnishes support for a child, "the county has the same right as the child to secure reimbursement . . . ." (§ 4002, subd. (b).) The majority opinion does not address the impact of its "active concealment" based estoppel on the right of the county to collect arrearages.

[7]See *Dorsey* v. *Dorsey, supra,* 408 N.E.2d 502, 504: "Initially, we note that child support arrearages constitute a vested right under Illinois law and are specifically enforceable under URESA. [Citations.] Also, even after a child reaches majority, the custodian does not lose her right to recover arrearages which accrued at the time of the child's minority." Accord, *Dept. of Health & Rehab. Serv.* v. *Bachtal* (Fla.Dist.Ct.App. 1988) 517 So.2d 787, 788; *Johnson* v. *State* (1983) 167 Ga.App. 508 [306 S.E.2d 756]; *Ackerman* v. *Yanoscik* (Tex.Ct.App. 1980) 601 S.W.2d 72.

[8]Section 4834 permits submission of evidence by deposition or personal appearance. Deposition testimony by the obligee is manifestly inadequate if the obligor offers the "active concealment" defense in person unless the proceedings are continued after the obligor's testimony to permit the obligee to respond in a deposition.

residents of California.[9] If, as is probable, those courts refuse to entertain the "active concealment" defense, California obligees will fare better in the courts of other jurisdictions than in California.

This cannot have been the intent of the Legislature when it adopted RURESA. In Code of Civil Procedure former section 1694 (now recodified as Fam. Code, § 4845), the Legislature enacted verbatim the provision in section 23 of RURESA which specifies: "The determination or enforcement of a duty of support owed to one obligee is unaffected by *any* interference by another obligee with rights of custody or visitation granted by a court." (Italics added.) California adopted the Uniform Reciprocal Enforcement of Support Act in 1953 (Stats. 1953, ch. 1290, § 2, p. 2843), and adopted Code of Civil Procedure former section 1694 as part of the 1968 revised act in 1970. (Stats. 1970, ch. 1126, § 31, p. 2002.) The rule which the majority abrogate today was among those created to "cure defects" and "plug loopholes" in the original uniform act by establishing guidelines for the conduct of the trial in cases in which there had been interference with visitation rights. (See 9B West's U. Laws Ann. (1987) RURESA, prefatory note, p. 382; see also Comment, *The Uniform Reciprocal Enforcement of Support Act* (1961) 13 Stan.L.Rev. 901, 915-916 ["Since most support judgments are modifiable, to allow for change in the circumstances of the parties, they are enforceable only under the doctrine of comity, and are vulnerable to the vagaries of public policy defenses."].) The Legislature, in adopting section 23 of RURESA, was presumably aware of the purpose for which this part of former section 1694 was added to section 23 in the 1968 revision of the uniform act. By prohibiting consideration of visitation and custody issues in a RURESA enforcement proceeding, the uniform act clearly intends that "vagaries of public policy" such as those which the majority seek to import into the California statute will not affect those proceedings. Our Legislature enacted that statutory RURESA limitation which the majority now abrogate.

No other jurisdiction applying section 23 of RURESA recognizes the distinction suggested by the majority between "active concealment" and other types of "interference" with visitation and custody rights.[10] This is undoubtedly because concealment of the child, whether "active" or otherwise, is so clearly interference with visitation and custody. The statute is

---

[9]See *Brown* v. *Turnbloom, supra,* 280 N.W.2d 473, 474: "The act does not contemplate that the custodial parent come to the responding state to defend against claims arising from other domestic relations matters. Aggrieved noncustodial parents should return to the state of divorce to adjudicate other matters."

[10]Minnesota has expressly rejected the distinction. "However sympathetic one may be to Chamberland's difficult position, the statutes do not appear flexible enough to accommodate his appeal. Although Southwell did not inform Chamberland of her location, and in fact may have purposely concealed her location, so that Chamberland did not know where to send the payments, this 'wrongful conduct' does not take this action out of the purview of the statute

directed to "any" interference, not simply interference which does not involve "active concealment." The focus should not be on the degree of interference, but instead on whether any issue related to custody and visitation may be raised in a proceeding to enforce payment of arrearages. As a result of today's decision, the issue may be raised in any case, leaving to the decisionmaker the determination of whether the defendant's evidence is sufficient to establish "active concealment." A proceeding intended to be summary and expeditious will thereby be transformed into a battle over lost custody and/or visitation rights. The availability of the defense will encourage and reward parents who fail to comply with court orders for support, and, many years later when enforcement is attempted but evidence may be lost and memories dimmed, claim that the plaintiff "actively concealed" the child.

This is contrary to the purpose of the law and the intent of the Legislature. It will burden enforcement courts and prosecutors with hearings on issues that should be raised in the court having jurisdiction over the initial support or custody and visitation proceedings.

The Arizona Court of Appeal recognized that a parent's exclusive remedies for violation of visitation and custody rights lies in the court which made the custody and support orders where the parent may seek a contempt citation or modification of the support order. In *State* ex rel. *Arvayo* v. *Guererro* (1974) 21 Ariz.App. 173 [517 P.2d 526], the court affirmed an order dismissing a Uniform Reciprocal Enforcement of Support Act action to enforce support. The court emphasized that the duty of support is not affected by interference with custody and visitation rights, and noted that the obligee had made consistent efforts to enforce his rights through the judicial process before terminating support payments. Nonetheless, that was not the reason the order for dismissal was affirmed. Rather, it was affirmed because the court having jurisdiction over the support action had modified the decree by terminating the support obligation until the RURESA plaintiff agreed to honor visitation rights. To the same effect is *People* ex rel. *Winger* v. *Young* 1979) 78 Ill.App.3d 512 [33 Ill.Dec. 920, 397 N.E.2d 253], a case in which, allegedly, the custodial parent had moved to another state and kept the child's whereabouts secret. The court rejected the proffered defense stating: "The proper remedy for the violation of visitation rights is a petition for a rule to show cause why the non-complying party should not be held in contempt. The duty to permit visitation is completely independent of the duty to make support payments." (*Id.* at p. 254; see also *State* ex rel. *Dewyea* v. *Knapp, supra,* 674 P.2d 1104, 1106 ["If respondent desires to enforce his

---

nor the precedence of case law." (*State* ex rel. *Southwell* v. *Chamberland, supra,* 361 N.W.2d 814, 817.)

visitation rights, modify the support obligations or obtain custody of his children, then he must seek a forum that holds the proper jurisdiction to take evidence and rule on these matters."]; *State* ex rel. *Southwell* v. *Chamberland, supra,* 361 N.W.2d 814, 817 ["The law has given the other parent a remedy to go into court for an amended order."].)

I believe that properly applied rules of statutory construction, respect for the rule of law, and the importance of maintaining family ties bar creation of an estoppel to seek payment of arrearages in a RURESA action. A parent who does not use child locator services and seek judicial sanction for termination of support payments should not be permitted to claim years after discontinuing support payments that the child had been concealed. I cannot join in what is so clearly a departure from settled law—a decision which usurps the prerogatives of the Legislature, undermines otherwise uniform procedures for reciprocal enforcement of support obligations, and, by making available an "active concealment" defense, may encourage supporting parents to sever, rather than attempt to strengthen, their parental bonds.

I would reverse the judgment of the Court of Appeal.